PHILIP STOLLER AND MILDRED STOLLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stoller v. Commissioner
Docket No. 8731-72.
United States Tax Court
T.C. Memo 1983-319; 1983 Tax Ct. Memo LEXIS 474; 46 T.C.M. (CCH) 345; T.C.M. (RIA) 83319; June 6, 1983. Philip Stoller, for the petitioners. Richard A. Mandel and Jody Tancer, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined *476 deficiencies of income tax against petitioners and additions to tax against petitioner Philip Stoller as follows: Section 6653 (b) [1]
Tax Year
Deficiency
Additions to Tax
(Philip Stoller only)
1967
$127,463.84
$63,731.92
1968
59,348.65
28,174.32
After concessions, [2] the issues remaining for decision are as follows: (1) Whether the deficiency notice was issued by respondent prior to the expiration of the statute of limitations on assessment for the years 1967 and 1968; (2) whether respondent acted arbitrarily in determining deficiencies against petitioners for 1967 and 1968; (3) whether petitioners realized additional income in 1967 and 1968 as determined by respondent through the use of the bank deposits method of income reconstruction; (4) whether the amounts of $120,000 and $47,000 reported as short-term capital gain by petitioners in 1967 and 1968, respectively, should have been reported as ordinary *477 income for such years; (5) whether petitioners realized fee income of $1,500 in 1968 which was not reported for that year; and, (6) whether petitioner Philip Stoller is liable for additions to tax under section 6653(b) for the years 1967 and 1968. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by this reference. Philip Stoller (hereinafter referred to as petitioner) and Mildred Stoller (hereinafter referred to as Mildred) were husband and wife during the years in issue, and resided in Woodmere, New York, on the date the petition was filed in this case. They filed joint Federal income tax returns for years 1967 and 1968 and November 4, 1968, and October 13, 1969, respectively. *478 (Hereinafter when "petitioners" is used it will refer to both petitioner and Mildred). Respondent issued a statutory notice of deficiency pertaining to petitioners' 1967 and 1968 taxable years on August 30, 1972. 1. Petitioner's Income Producing Activities
Petitioner listed his occupation as "financial consultant" on his 1967 and 1968 returns. No occupation is listed for Mildred on such returns. During the years in issue, petitioner was actively and substantially engaged in trading commodity futures and securities. Additionally, petitioner acted as a financial consultant to certain individuals and entities. In this latter capacity, petitioner advised a Mr. Alfred Herbert, an account executive for Bank Hoffman of Zurich, Switzerland, regarding stocks and/or commodities which would be favorable purchases. Petitioner rendered these services pursuant to an agreement that he would receive a percentage of any profits that were generated by Bank Hoffman's purchase and sale of the stock or commodities that petitioner recommended. [3] Additionally, petitioner brought the stock of a company called General Neumismatic to the attention of C.E. Unterberg Towbin Company. As compensation *479 for his advice to C.E. Unterberg Towbin Company, the company tendered a check in the amount of $1,500 to petitioner in 1968. However, petitioner felt that this $1,500 was insufficient compensation for the services he rendered, and therefore returned the check uncashed to C.E. Unterberg Towbin Company. At or about 1975, petitioner received $3,000 in full satisfaction of his services rendered to C.E. Unterberg Towbin Company in 1968. *480 Petitioners received no inheritance in any form either prior to or during 1967 or 1968; nor did petitioners receive any nontaxable or excludable income from other sources during the years in issue. [4]
2. Petitioners' Tax Returns
Petitioners' 1967 and 1968 Federal income tax returns were prepared by Sol Bennett, a Certified Public Accountant. Mr. Bennett was neither personally acquainted with petitioners nor had any personal knowledge of petitioner's income producing activities, and prepared petitioners' returns from documents and records submitted to him by petitioner. Although petitioner was engaged in complicated financial transactions involving commodity futures and securities, the records provided to Mr. Bennett were loose and disorganized, and were generally not adequate records of the types of transactions petitioner was engaged in. For example, although petitioner engaged in a large number of commodity transactions, the buy and sell slips relating these to transactions were not matched, and at times were incomplete. *481 Because of this, Mr. Bennett had difficulty in matching up several of the buy and sell slips provided him, and was therefore unable to prepare a breakdown of all of the individual transactions which resulted in capital gains or losses. Where petitioner's records contained inadequate information from which Mr. Bennett could prepare a transactional breakdown of each commodity or security buy and sell that petitioner engaged in during the years in issue, Mr. Bennett prepared summary schedules of capital gains and losses according to the records provided him, in lieu of a transactional breakdown. These summary schedules were prepared from information contained in various transcripts of stock and commodity accounts which were provided to Mr. Bennett by petitioner, and which listed various debits and credits in petitioner's name. Mr. Bennett had do independent knowledge of whether these records were reflective of all of the transactions petitioner entered into during the years in issue. When Mr. Bennett completed his schedules of petitioner's 1967 and 1968 commodity and security transactions, he gave the schedules to petitioner for his review. Petitioner reviewed these schedules *482 for approximately one-half hour in Mr. Bennett's office, never questioned the accuracy of the schedules, and told Mr. Bennett to prepare his 1967 and 1968 returns from these schedules, which Mr. Bennett did. On their 1967 return, as prepared by Mr. Bennett, petitioners reported the following items of gross income from the following sources: Source
Amount [5]
Character
Kroll, Dillon & Co.
Short-Term
Nominee Stock Account
$10,490.84
Capital Gain
L. J. Forget
Short-Term
Nominee Stock Account
120,000.00
Capital Gain
Interest Income
1,526.50
Ordinary Income
Salary From Levin Stoller & Co.
100.00
Ordinary Income
Total
$132,117.34
*483 In arriving at total (adjusted gross) income, as reported on line nine of their 1967 return, petitioners reduced the above gross gains by the following losses from the following sources: Source
Amount [6]
Character
Kroll, Dillon & Co.
Short-Term
Nominee Commodity Account
($8,140.50)
Capital Loss
L. J. Forget
(20,000.00)
Short-Term
Nominee Commodity Account
Capital Loss
Levin Stoller Co.
(1,678.51)
Short-Term
Capital Loss
Alleghany Mining
(12,700.00)
Short-Term
(Worthless Stock)
Capital Loss
Carryover From 1966
(26,717.00)
Short-Term
Capital Loss
Levin Stoller Co.
(285.39)
Section 1231 Loss
Total Short-Term
Capital Loss
($69,521.40)
Levin Stoller Co.
($5,109.02)
Ordinary Loss
79 Wall St. Corp.
Ordinary Loss
(A Subchapter S Corp)
($10,611.54)
Total Ordinary Loss
($15,720.56)
*484 After reducing their short-term capital gains by the above short-term capital losses and the section 1231 loss, and further deducting the above ordinary losses, petitioners reported total income on line nine of their 1967 return of $46,875.38. Petitioners then claimed $6,377.87 worth of itemized deductions, and claimed five exemptions, totaling $3,000. Petitioners thus computed their 1967 tax on taxable income of $37,497.51. On their 1968 return, as prepared by Mr. Bennett, petitioners reported the following items of income from the following sources: Source
Amount
Character
Partnership and Fiduciaries
[7] $47,000.00
Short-Term
Capital Gain
Commodity Futures Contracts (Sugar)
[8] 8,052.00
Short-Term
Capital Gain
Commodity Futures Contracts (Cocoa)
[8] 509.00
Short-Term
Capital Gain
Commodity Futures Contracts (Silver)
[8] 48,882.50
Long-Term
Capital Gain
Interest Income
1,994.86
Ordinary Income
Total
$106,438.36
*485 In arriving at total income, as reported on line nine of their 1968 return, petitioners reduced the above gross gains by the following losses and deductions, from the following sources: Source
Amount
Character
Commodity Futures
Short-Term
Contracts (Potatoes)
[9] $ (6,385.00)
Capital Loss
Commodity Futures
Short-Term
Contracts (Silver)
[9] (13,233.75)
Capital Loss
Commodity Futures
Short-Term
Contracts (Silver)
[9] (1,320.00)
Capital Loss
Commodity Futures
Short-Term
Contracts (Silver)
[9] (1,390.00)
Capital Loss
Total Short-Term Capital Loss
$ (22,328.75)
Commodity Futures
Long-Term
Contracts (Sugar)
[9] $ (2,588.00)
Capital Loss
Commodity Futures
Long-Term
Contracts (Silver)
[9] (16,283.75)
Capital Loss
Total Long-Term Capital Loss
$ (18,871.75)
Section 1201 Deduction
$ (15,005.37)
Offset against
(Computed by reference to
Net Long-Term
$30,010.75 Net Long-Term
Capital Gains
Capital Gain)
79 Wall St. Corp.
(4,395.87)
Ordinary Loss
*486 Thus, petitioners reported total (adjusted gross) income on line nine of their 1968 return of $45,836.62. Petitioners then claimed $8,551.32 worth of itemized deductions, and claimed five exemptions, totaling $3,000. Petitioners thus computed their 1968 tax on taxable income of $34,285.30. 3. Investigation of Petitioners' Returns
In 1969, respondent's agent, Robert Blumenfeld, was assigned to audit petitioners' Federal income tax returns. Mr. Blumenfeld contacted petitioners and informed them that their returns were being audited, and was subsequently told that Mr. Bennett (petitioners' accountant) would represent petitioners with regard to the audit. In his conduct of the audit of petitioners' returns, Mr. Blumenfeld went to Mr. Bennett's office and examined certain of petitioners' records relating to their 1967 and 1968 tax years. However, the records which were in the possession of Mr. Bennett were incomplete, and did not provide Mr. Blumenfeld with the information he required to complete his audit. These documents contained only incomplete checking account records, and did not include any savings account statements or brokerage account statements. Upon his *487 discovery that the records of petitioners which were made available to him were incomplete, Mr. Blumenfeld compiled a list of information he would need in order to finish his audit, and asked Mr. Bennett to acquire this information from petitioners. Mr. Bennett then contacted petitioner and informed him of Mr. Blumenfeld's requests for further information. Petitioner, however, refused to comply with these requests, and to the contrary, took place all of his records from Mr. Bennett and mde it clear that no records would be made available to Mr. Blumenfeld in the future. In light of petitioner's refusal to cooperate with respondent, Mr. Bennett informed petitioner that he would no longer represent him. Since petitioner refused to accede to Mr. Blumenfeld's requests for further information, it became necessary for Mr. Blumenfeld to acquire the information required to complete his audit through other means. In this regard, Mr. Blumenfeld issued administrative summonses to numerous banks and brokerage firms with which petitioner maintained accounts, requesting transcrips of such accounts for 1967 and 1968. [10] After these summonses were issued, Mr. Blumenfeld was transferred to *488 a different audit group and the audit of petitioners' returns was reassigned to Louis Gallaro, another agent of respondent's, on October 9, 1970. As part of his examination of petitioners' 1967 and 1968 returns, Mr. Gallaro analyzed the various bank and brokerage accounts statements which were transmitted to respondent pursuant to Mr. Blumenfeld's administrative summonses. Through this examination, Mr. Gallaro attempted to determine which deposits made by petitioners in their various accounts constituted possible unexplained and unreported income. The following technique was employed: Mr. Gallaro first totaled all deposits that were made to accounts maintained in either or both of petitioners' names. He then examined the various statements of account in an attempt to determine which deposits represented mere retransfers of funds from one account to another, deposits of the proceeds of loans, or credit memos representing loans, since such deposits would not represent income items. In determining those *489 amounts that constituted retransfers of funds, Mr. Gallaro operated under a handicap since he was not in possession of copies of the actual checks or deposit slips which evidenced each deposit, and therefore could not varify the origin of each deposit. He therefore considered any amount that was deposited to a particular account to represent a transfer from another account of petitioners where a check was drawn or a withdrawal was made on that other account in the identical amount of the deposit within a short (undisclosed) time of the deposit.
As the result of this analysis, Mr. Gallaro concluded that deposits totaling $313,681.84 and $130,124.85 were made to petitioners' accounts in 1967 and 1968, respectively. He further concluded that, of these total amounts, $168,322.78 and $32,347.71 represented mere transfers of funds from one account to another and deposits of loan proceeds in 1967 and 1968, respectively. Based on Mr. Gallaro's conclusion, respondent determined in his statutory notice that petitioners had received unreported income of $145,359.06 in 1967 and $97,777.14 in 1968. In arriving at this determination, respondent gave no credit for amounts of income petitioners *490 reported on their 1967 and 1968 returns. Nor was any attempt made by respondent to eliminate deposits representing return of capital, such as proceeds from the sale of stock or commodities. Moreover, respondent did not add any amounts to the amounts aserted to be petitioners' unreported income to take account of estimated living expenses. In preparation for trial herein and based upon conferences held with petitioner, Mr. Gallaro reexamined petitioners' transcripts of account and concluded that certain adjustments to the bank deposits analysis contained in the notice of deficiency were required. Specifically, Mr. Gallaro concluded that petitioners were properly chargeable with unreported income due to unexplained deposits of $115,063.47 and $70,329.71 for 1967 and 1968, respectively. Accordingly, prior to trial herein, respondent reduced the amounts asserted as unreported income from unexplained deposits in the notice of deficiency, as above, thus making a concession, to this extent, in petitioners' favor. At pretrial conference with petitioner, it further developed that respondent might not have considered certain sources of unreported income which had not theretofore been *491 revealed to him. Petitioner was requested to supply respondent with appropriate books and records from which respondent could determine whether additional amounts of income should be attributed to petitioners. Petitioner, however, did not supply these books and records and respondent therefore issued an administrative subpoena to petitioners' new accountants, Berlin and Davis, who petitioner had stated were in possession of said books and records. Berlin and Davis complied with this summons, and the records respondent received contained a tax return of a Subchapter S corporation called 79 Wall Street Corporation. This return revealed that in 1967 petitioner, a 50 percent shareholder, made a capital contribution of $500 and a loan of $15,187.50 to 79 Wall Street Corporation. Respondent considered this total amount of $15,687.50 to be additional unreported income of petitioners' in 1967. Additionally, respondent reduced the total amount previously determined as unreported income from unexplained deposits for 1967 by $2,000. This amount was determined by respondent, upon a final review of Mr. Gallaro's bank deposits analysis, to represent a transfer by petitioner from Lawrence *492 Cedarhurst Federal Accounts to his Peninsula National Bank Account on April 16, 1967. Finally, respondent, through his examination of these new found documents, determined that an additional deposit of $3,500 was made by petitioner in 1967 to a brokerage account he maintained with Charles Plohn & Co. However, respondent also determined that this amount represented a mere transfer of funds from petitioners' account at Chemical Bank. This item therefore resulted in no additional income, according to respondent. Thus, after these adjustments, the total amounts of petitioners' unreported income which respondent now contends to be evidenced by unexplained deposits, or loans and capital contributions to 79 Wall St. Corp. are as follows: [11]
1967
1968
$128,750.97
$70,329.71
During his audit of petitioners' 1967 and 1968 return, Mr. Gallaro also questioned the summary amounts of short-term capital gains petitioners reported therein. Specifically, Mr. Gallaro questioned the $120,000 and $47,000 which petitioners reported as lump sum figures in 1967 and 1968, respectively. [12] *493 He asked petitioner to provide books and records which would support the capital gain characterization of these items, but petitioner refused. Respondent, in his statutory notice, therefore determined that these amounts represented ordinary income to petitioners in addition to the amounts developed through respondent's bank deposits analysis. Respondent also determined that the $1,500 check that petitioner received from C.E. Unterberg Towbin Company in 1968 was additional unreported income chargeable to petitioners for that year. Petitioners' income tax liability for 1967 and 1968 was recomputed accordingly. 4. Adjustments to Respondent's Bank Deposits Analysis
Documentary evidence submitted by respondent in support of his bank deposits analysis clearly establishes that during 1967 and 1968 petitioners maintained numerous bank and brokerage accounts. Some of these accounts were maintained jointly by petitioner and Mildred, and some were maintained individually either by petitioner or *494 Mildred. Two bank accounts were also maintained in the joint names of Mildred and her mother, Ruth Pollin. Additionally, petitioner maintained a bank account in the name of Philip Stoller & Co. Except for one specific adjustment noted below, we find respondent's revised calculations of deposits to these accounts to be supported by the record. Accordingly, we find that the cash deposits made to these various accounts in 1967 were as follows: [13]
Type of Account
Bank or Broker
Account No.
or Transfer
Deposits * Bankers Trust Co.
31-343-575
Checking
$ 9,550.00 * Bankers Trust Co.
74-809
Savings
150.00 * Peninsula National
Bank
3-00-805-7
Checking
27.630.44
+/- Bushwick Savings
Bank
4348
Savings
10,000.00 * Lawrence Cedarhurst
Fed. Sav.
33309
Savings
11,075.00
tt Lawrence Cedarhurst
Fed. Sav.
32276
Savings
3,277.00 * Lawrence Cedarhurst
Fed. Sav.
28169
Savings
6,105.50 * Lawrence Cedarhurst
Fed. Sav.
28319
Savings
5,145.50
+/- Lawrence Cedarhurst
Fed. Sav.
28320
Savings
100.00
tt Lawrence Cedarhurst
Fed. Sav.
27885
Savings
8,330.40
+ E.T. Lynch & Co.
26-8020-5
Brokerage
[14] 23,199.04
+ Kroll, Dillon & Co.
7980-1-25
Brokerage
9,900.00
+ Kroll, Dillon & Co.
7980-2-25
Brokerage
29,265.00
+ Dishy, Easton & Co.
Brokerage
34,578.84 * First National City
Bank
11-915-388
Checking
38,541.33
+ Edward Henderson & Co.
Brokerage
10,587.50
o Chemical Bank
016-031-776
Checking
81,319.14
+ Weis, Voisin &
Cannon, Inc.
00-69352
Brokerage
3,000.00
+ Charles Plohn & Co.
30-00356
Brokerage
3,500.00
79 Wall St. Corp.
Loan
15,187.50
79 Wall St. Corp.
Contribution
to Capital
500.00
Total Deposits
$330,942.19
*495 During 1968, cash deposits were made to petitioners' accounts as follows: [15]
Bank or Broker
Account No.
Type of Account
Deposits * Bankers Trust Co.
31-343-575
Checking
$ 38,914.89 * Bankers Trust Co.
74-809
Savings
950.00
tt Lawrence Cedarhurst
Fed. Sav.
32276
Savings
122.80 * Lawrence Cedarhurst
Fed. Sav.
28169
Savings
454.00 * Lawrence Cedarhurst
Fed. Sav.
28319
Savings
59.00
+/- Lawrence Cedarhurst
Fed. Sav.
28320
Savings
3,071.21
tt Kroll, Dillon & Co.
7980-2-25
Brokerage
5,455.50
+ Weis, Voisin &
Cannon, Inc.
00-69352
Brokerage
3,700.00
o Chemical Bank
036-001589
Checking
51,201.57
Total Deposits
$103,928.97
*496 During 1967 and 1968 the various accounts listed above were quite active. More than 170 deposits were made to these accounts in total, and more than 900 checks were drawn or withdrawals were made on these accounts during these years. We have carefully examined the ledgers and statements of accounts from the various financial institutions and brokerage firms to determine the extent to which deposits to the various accounts represented merely transfers of funds from one of the listed accounts to another or deposits of the proceeds of loans. In this examination, we employed the following assumptions: Those deposits which respondent has determined to constitute transfers were accepted as such. Additionally, we aligned the deposits made to these accounts with the various checks drawn and withdrawals made on these accounts, and considered any deposit to constitute a transfer where a withdrawal was made, or a check was drawn on any other account in the identical amount of the deposit within four banking days preceeding (in the case of a withdrawal) *497 or following (in the case of a check), the deposit under examination. [16] Based upon the above analysis, we find that the following deposits represent transfers of funds from one of petitioners' accounts to another, or deposits of loan proceeds: 1967 Tax Year
Transfer to or Loan
Deposited In
Transfer From
Date
Amount
Bankers Trust Co.
Kroll, Dillon & Co.
10/4/67
$ 3,000.00
No. 31-343-575
No. 7980-225
Bankers Trust Co.
Chemical Bank
11/3/67
2,500.00
No. 31-343-575
Bankers Trust Co.
Chemical Bank
12/5/67
3,000.00
No. 31-343-575
Peninsula Nat. Bank
Lawrence Cedarhurst
4/17/67
2,000.00
No. 300-805-7
Fed. Sav. No. 33309
Peninsula Nat. Bank
Lawrence Cedarhurst
5/8/67
2,200.00
No. 300-805-7
Fed. Sav. No. 33309
Peninsula Nat. Bank
Dishy Easton & Co.
5/19/67
5,000.00
No. 300-805-7
Peninsula Nat. Bank
First Nat. City
6/9/67
4,000.00
No. 300-805-7
Peninsula Nat. Bank
Dishy Easton & Co.
8/3/67
1,000.00
No. 300-805-7
Peninsula Nat. Bank
Chemical Bank
9/5/67
3,000.00
No. 300-805-7
Lawrence Cedarhurst
First Nat. City
6/13/67
$ 2,000.00
Fed. Sav. No. 33309
Lawrence Cedarhurst
First Nat. City
6/13/67
2,000.00
Fed. Sav. No. 32276
Lawrence Cedarhurst
First Nat. City
6/13/67
2,000.00
Fed. Sav. No. 28169
Lawrence Cedarhurst
First Nat. City
6/13/67
2,000.00
Fed. Sav. No. 28319
Kroll, Dillon & Co.
Dishy Easton & Co.
5/13/67
2,800.00
No. 7980-1-25
Kroll, Dillon & Co.
Kroll, Dillon & Co.
9/14/67
2,000.00
No. 7980-1-25
No. 7980-2-25
Kroll, Dillon & Co.
Chemical Bank
10/31/67
5,000.00
No. 7980-1-25
Kroll, Dillon & Co.
Kroll, Dillon & Co.
7/13/67
3,225.00
No. 7980-2-25
No. 7980-1-25
Kroll Dillon & Co.
Dishy Easton & Co.
7/20/67
12,000.00
No. 7980-2-25
Dishy Easton & Co.
First Nat. City
6/13/67
26,541.33
(Margin Account)
Dishy Easton & Co.
Cash Account
8/14/67
123.10
(Margin Account)
Dishy Easton & Co.
Dishy Easton & Co.
Short Account
5/11/67
1,125.00
(Cash Account)
Dishy Easton & Co.
Dishy Easton & Co.
Cash Account
5/15/67
1,181.37
(Stock Account)
Dishy Easton & Co.
Dishy Easton & Co.
Margin Account
6/29/67
408.04
(Stock Account)
Dishy Easton & Co.
First Nat. City
Dishy Easton & Co.
5/29/67
38,541.33
No. 11-915388
E.F. Henderson & Co.
Chemical Bank
8/31/67
10,587.50
Chemical Bank
Dishy Easton & Co.
8/8/67
$ 5,637.99
Chemical Bank
Dishy Easton & Co.
8/14/67
4,036.25
Chemical Bank
Kroll, Dillon & Co.
8/29/67
10,000.00
Chemical Bank
Kroll, Dillon & Co.
8/31/67
5,000.00
Chemical Bank
E.F. Henderson & Co.
9/13/67
9,000.00
Chemical Bank
Kroll, Dillon & Co.
10/3/67
17,012.40
Chemical Bank
Loan (Credit Memo.)
10/11/67
18,767.64
Weis Voisin,
Cannon, Inc.
Chemical Bank
12/22/67
3,000.00
Charles Plohn & Co.
Chemical Bank
8/17/67
3,500.00
Total Transfers
and Loans
[17] $213,186.65
*498 1968 Tax Year
Transfer to or Loans
Deposited In
Transfer From
Date
Amount
Bankers Trust Co.
Chemical Bank
1/5/68
$ 3,000.00
No. 31-343-575
Bankers Trust Co.
Chemical Bank
3/18/68
1,500.00
No. 31-343-575
Bankers Trust Co.
Chemical Bank
4/2/68
2,000.00
No. 31-343-575
Bankers Trust Co.
Chemical Bank
5/14/68
1,000.00
No. 31-343-575
Bankers Trust Co.
Chemical Bank
9/6/68
4,000.00
No. 31-343-575
Bankers Trust Co.
Chemical Bank
9/30/68
$ 3,000.00
No. 31-343-575
Bankers Trust Co.
Loan (Credit Memo.)
1/30/68
3,091.69
No. 31-343-575
Bankers Trust Co.
Bankers Trust Co.
1/30/68
300.00
No. 74-809
Kroll, Dillon & Co.
Kroll, Dillon & Co.
2/2/68
1,755.50
No. 7980-2-25
No. 7980-1-25
Kroll, Dillon & Co.
Bankers Trust Co.
6/5/68
2,600.00
No. 7980-2-25
Weis, Voisin &
Cannon, Inc.
Chemical Bank
1/10/68
2,200.00
No. 00-69352
Weis, Voisin &
Cannon, Inc.
Chemical Bank
2/14/68
1,500.00
No. 00-69352
Chemical Bank
Weis, Voisin &
1/16/68
3,637.74
Cannon, Inc.
Chemical Bank
Weis, Voisin &
3/11/68
4,014.33
Cannon, Inc.
Total Transfers
and Loans
[18] $33,599.26
*499 Thus, we find that deposits, contributions to capital and loans totaling $340,442.19 were made to petitioner's various accounts and Subchapter S corporation in 1967. In 1968, deposits totaling $103,929.97 were made to petitioners' various accounts. Of these total deposits, $213,186.95 represented mere transfers of funds from one account to another, or the deposit of loan proceeds in 1967, while $33,599.26 represented such transfers and deposits of loan proceeds in 1968. Accordingly, we find that the following net cash deposits were made to petitioners' accounts during the following years: 1967
1968
Total Deposits
$330,942.19
$103,928.97
Total Transfers & Loans
213,186.95
33,599.26
Net Deposits
$117,755.24
$ 70,329.71
5. Petitioner's Educational and Criminal Background
Petitioner holds a Bachelor of Business Administration degree, has operated a financial advisory service, as well as several other businesses, and, during the years in issue, was highly experienced in the securities and commodities trading field. *500 On February 14, 1974, petitioner was indicted and charged with various violations of Federal criminal law. In such indictment, petitioner was charged with, inter alia, violations of criminal statutes stemming from his participation in a fraudulent scheme whereby petitioner and others manipulated a stock known as Training With the Pros. On October 17, 1974, petitioner was found guilty of certain charges contained in the above indictment including his employment of fraudulent interstate transactions, manipulative nd deceptive devices, frauds and swindles, mail fraud, and making false statements and concealing information from the Securities and Exchange Commission. [19]
The stock manipulation scheme of which petitioner was found guilty commenced in mid-1968 and continued until mid-1969. Petitioners underpaid their 1968 income tax, it least a part of which was due to petitioner's fraud. OPINION Respondent determined deficiencies in petitioners' Federal income tax for each *501 of their tax years 1967 and 1968. Additionally, respondent determined that petitioner is liable for additions to tax under section 6653(b) for each of said years. The deficiency determined by respondent with respect to petitioners' 1967 tax year resulted from two adjustments which remain in dispute. First, respondent, by use of the so-called bank deposits method, determined that petitioners had received income of $128,750.97 [20] which they failed to report on their 1967 Federal income tax return. Respondent therefore increased petitioners' taxable income, as reported, by said amount. Second, respondent determined that $120,000 which was reported by petitioners as short-term capital gain, in fact represented ordinary income. The deficiencies determined by respondent with respect to petitioners' 1968 tax year resulted from three adjustments which remain in dispute. First, respondent, again by use *502 of the bank deposits method, determined that petitioners received income of $70,329.71 [21] which they failed to report on their 1968 Federal income tax return. Respondent therefore increased petitioners' taxable income, as reported, by said amount. Second, respondent determined that $47,000 reported by petitioners as short-term capital gain should have been reported as ordinary income. Third, respondent determined that petitioners received fee income of $1,500 which they failed to report on their Federal income tax return, and which was not included in the above-mentioned bank deposits analysis. Accordingly, respondent increased petitioners' taxable income, as reported, by said amount. Petitioners contest respondent's determinations on several grounds. First, petitioners argue that respondent is barred by the statute of limitations from assessing and collecting the asserted deficiencies and additions *503 to tax for both 1967 and 1968. Second, petitioners argue that, in any event, respondent acted "arbitrarily and capriciously" in resorting to the bank deposits method to determine petitioners' income for the years in issue. Third, petitioners contend that even asuming respondent was justified in resorting to the bank deposits method, respondent improperly applied that method in determining petitioners' income. Fourth, petitioners maintain that respondent acted arbitrarily in determining that amounts petitioners reported as short-term capital gain in 1967 and 1968 in fact represented ordinary income. Fifth, petitioners contend that $1,500 was no received by them in 1968. Finally, petitioner asserts that he did not act fraudulently in either 1967 or 1968. Respondent concedes that the 1967 tax year is barred by the statute of limitations unless fraud or the six-year statute of limitations is applicable. Sections 6501(a), 6501(c)(1), 6501(e)(1)(A). Thus, the analytical focus differs for each of the tax years in dispute. We will therefore consider each year separately. 1967 Tax Year
I Statute of Limitations
*504 Section 6501(a)[22] provides that, in general, the amount of any tax must be assessed within three years after the taxpayer filed his return. Section 6501(c)(1)[23] provides an exception to this general rule where a taxpayer has filed a false or fraudulent return with intent to evade tax. In such case, the income tax due with respect to the fraudulently filed return may be assessed, or a proceeding in court for the collection of such tax may be commenced without assessment, at any time. Section 6501(e)(1)(A)[24] provides a further exception to the general three-year statute of limitations where a taxpayer omits properly includable gross income from his return in an amount in excess of 25 percent of the amount of gross income stated in the return. In such case, the income tax due with respect to such return may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, within six years after the return was filed. *505 As noted above, respondent concedes that the notice of deficiency herein was mailed to petitioners more than three years after they filed their 1967 return. Thus, absent a showing of fraud or 25 percent omission from gross income for 1967, the statute of limitations bars assessment of any deficiency for that year. II Fraud
Section 6653(b) provides in pertinent part: (1) In General.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. Section 6653(c) provides that, for these purposes, the term "underpayment" is to be equated with a "deficiency" as defined in section 6211.
The burden of proving fraud is on respondent. Section 7454(a); Rule 142(b). In order to sustain this burden, respondent must affirmatively show, through clear and convincing evidence, that petitioner underpaid his taxes and that such underpayment resulted from an *506 intentional wrongdoing designed to evade taxes believed to be owing. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Stone v. Commissioner,56 T.C. 213, 220 (1971); Miller v. Commissioner,51 T.C. 915, 918 (1969); York v. Commissioner,24 T.C. 742, 744 (1955). Although respondent need not show the precise amount of the underpayment which resulted from fraud, Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court, it must at least be shown that some fraudulent. underpayment of tax in fact existed in order for respondent to prevail. See Shaw v. Commissioner,27 T.C. 561, 570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). Moreover, respondent may not, in any manner, rely upon the so-called presumption of correctness which generally attaches to determinations contained in the statutory notice of deficiency, Welch v. Helvering,290 U.S. 111 (1933), in attempting to sustain his burden of proof. This presumption of correctness is not evidence, Kentucky Trust Co. v. Glenn,217 F.2d 462, 465-466 (6th Cir. 1954), *507 and statements contained in the notice of deficiency therefore cannot constitute proof of the facts asserted therein. See, Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955), affg. in part, revg. and remanding in part a Memorandum Opinion of this Court; Shaw v. Commissioner,supra;York v. Commissioner,supra;Joseph v. Commissioner,32 B.T.A. 1192, 1204 (1935). [25] Thus, respondent must present independent, affirmative evidence of a clear and convincing nature that petitioner underpaid his tax in some amount, in addition to demonstrating the requisite fraudulent intent, in order for the statute of limitations to be lifted in the present case for 1967. Respondent's assertion that petitioners underpaid their tax for 1967 is based upon two determinations that remain in dispute. [26] First, respondent determined that petitioners made "unexplained" bank deposits of $128,750. Second, respondent determined that certain amounts reported *508 by petitioners as short-term capital gain should have been reported as ordinary income. With respect to this latter determination, we hold that respondent has failed to sustain his burden of proof. Respondent has failed to offer clear and convincing affirmative evidence which would support the proposition that any portion of the $120,000 that petitioners reported as short term capital gain in fact represented ordinary income to petitioners. To the contrary, it is clear that respondent relies solely upon inference and presumption in support of this assertion. In fact, respondent makes *509 several arguments on brief based upon an absence of proof, apparently forgetful of the fact that, with respect to fraud, the proof is his burden. Drieborg v. Commissioner,supra;Shaw v. Commissioner,supra;York v. Commissioner,supra.
Mr. Gallaro, the agent in charge of auditing petitioners' 1967 return, testified that a special agent informed him that there was information that petitioner earned fee income from Bank Hoffman, and that the $120,000 reported by petitioners as short-term capital gain may have represented such fees. [27] On brief respondent appears to rely on this testimony as proof that petitioner, in fact, received these amounts as fee income. Such reliance is clearly unwarranted. In addition to being hearsay (to which petitioner did not object), the testimony itself is, at best, equivocal, and does not, even on its face, represent clear and convincing evidence that petitioner received fee income in any amount in 1967 or that the $120,000 reported by petitioners as short-term capital gain should have been reported as ordinary income. *510 Respondent also attempts to rely upon certain testimony of petitioner in the present case in conjunction with his testimony before the Securities and Exchange Commission [28] in support of his present assertion. In the instant case, petitioner testified that he advised an account executive of Bank Hoffman regarding what stocks the Bank should buy or sell. Petitioner further testified before the Securities and Exchange Commission that he spent only a small amount of time rendering these advisory services and that: "If it works out properly, I receive a percentage of potential profits, but I'm not on a retainer or a fee with them in any sense. It is dependent upon success." It is not clear from the record as to which years the above testimony relates, although there is *511 some indication that petitioner was engaged in these advisory activities during 1967. However, respondent has not demonstrated what, if any, advice petitioner provided in 1967, or the extent to which such alleged advice proved to be profitable to the Bank in that year. We cannot, through inference, assume that petitioner's advisory activities generated income to him in the absence of any affirmative evidence demonstrating such. The above testimony does not affirmatively demonstrate that petitioner received any fee income from Bank Hoffman in 1967. Moreover, the testimony of one of respondent's own witnesses is in direct conflict with respondent's position herein. Mr. Bennett, the certified public accountant who prepared petitioners' 1967 return, testified that the $120,000 figure reported as short-term capital gain on petitioners' 1967 return derived from his examination of the transcripts of petitioners' brokerage accounts. This amount, according to Mr. Bennett, represented a summary of the various transactions recorded in such transcripts during 1967. Mr. Bennett was unrelated to petitioners, was not personally acquainted with petitioners prior to the time he was employed *512 to prepare petitioners' 1967 return, and in fact refused to represent petitioners before the Internal Revenue Service when it became apparent that petitioner would not cooperte with respondent's agents in their conduct of the audit of petitioners' returns. In short, we found the unimpeached testimony of Mr. Bennett to be credible, and such testimony was directly contrary to respondent's attempt to recharacterize as fee income the $120,000 reported by petitioners as gains from the sale of stock. Respondent nevertheless argues that his attempt is supportable on the record before us.Respondent on brief states that * * * the potential for ordinary gains rather than capital gains is quite distinct even if there really were stock sales. [Petitioner] could have been deemed to be a securities dealer, holding for resale to customers, and thereby producing ordinary gains. [Petitioner] could have been receiving stock or commodities as compensation for services * * * thus resulting in ordinary gains * * *. Although petitioner "could have" been a dealer in securities, or "could have" been receiving stocks or commodities as compensation for services, there has been no such affirmative *513 showing by respondent on this record. No transcripts of the L. J. Forget account have been entered into evidence. This is the account which generated the $120,000 gain to petitioners in 1967 according to their return. Nor has respondent offered documentary or testimonial evidence which would support a finding that the securities which purportedly generated this gain were purchased for petitioners by any third party. Although petitioner failed to provide books or records which would explain the various transactions which resulted in the $120,000 gain as reported, and indeed made little effort to document them, this failure cannot serve to lessen the burden of proof which is placed upon respondent by statute where, as here, respondent seeks to reopen an otherwise closed year by asserting fraud. See Shaw v. Commissioner,supra;York v. Commissioner,supra;Joseph v. Commissioner,supra.
Respondent also has asserted deficiencies against petitioners based upon what respondent contends were "unexplained deposits." Respondent effectively contends that the entire amount of these deposits was received by petitioners *514 from taxable sources in 1967 and that they failed to report any of such amounts on their 1967 return. In order to sustain his burden of proof to show an underpayment, respondent must offer clear and convincing evidence which, at least in part, supports each of the above two contentions. Even assuming that respondent has entered sufficient evidence in support of his contention that the "unexplained" deposits were received by petitioners from taxable sources in 1967, [29] see Holland v. United States,348 U.S. 121, 137-138 (1954); United States v. Massei,355 U.S. 595 (1958), he has nonetheless failed to affirmatively show that any portion of these deposits were not reported on petitioners' 1967 returns. The record shows, and we have found, that deposits, loans, and contributions to capital of $117,755.24 *515 were made to petitioners' accounts in 1967 which did not represent retransfers among their various accounts or deposits of the proceeds of loans. The record also reveals that on their 1967 return, petitioners reported gross gains from commodity transactions of $130,490.84, interest income of $1,526.50 and salary income of $100. Of this total amount of reported income, $120,000 was, according to petitioners' return, generated by transactions in the L. J. Forget nominee account.No transcripts of this account have been submitted into evidence, and respondent has not otherwise clearly and convincingly established that such amount was not deposited in petitioners' various other accounts in 1967. [30] It is also clear that no portion of these amounts have already been credited to petitioners as redeposits of funds in respondent's bank deposits analysis. It is therefore possible that these reported amounts account for 100 percent of the deposits to petitioners' account which did not constitute mere redeposits or deposits of loan proceeds. *516 For us to hold that any portion of the $117,755.24 deposited to petitioners' accounts in 1967 represented unreported income would therefore require us to draw inferences, or apply presumptions, which have not been supported by affirmative evidence of a clear and convincing nature in this record. This we cannot do where, as here, the burden of proof rests with respondent. Estate of Beck v. Commissioner,56 T.C. 297 (1971); Arlette Coat Co., Inc. v. Commissioner,14 T.C. 751 (1950). We must reiterate that, although petitioner failed to provide books and records which would show that the amounts reported on their 1967 return were, in fact, deposited to their accounts, this failure cannot serve to lessen respondent's statutorily imposed burden. Shaw v. Commissioner,supra;York v. Commissioner,supra. Respondent cannot rely upon the presumptive correctness of his deficiency notice in this context until he affirmatively establishes that some minimal fraudulent underpayment of tax existed. Any lesser standard of proof would require us to convert the presumption of correctness into an affirmative finding *517 of fact, and this we clearly cannot do. See Otsuki v. Commissioner,53 T.C. 96, 106 (1969); Pigman v. Commissioner,31 T.C. 356, 370 (1958). We hold that respondent has failed to affirmatively establish that petitioners underpaid their taxes in 1967, and has thus failed to present a prima facie case of fraud under section 6653(b) with respect to that year. He therefore may not rely upon the provisions of section 6501(c)(1) to extend the normal three-year period of limitations. [31]
*518 III 25 Percent Omission
As noted above, section 6501(e)(1)(A) provides a further exception to the general three-year statute of limitations where a taxpayer omits properly includable income from his return in an amount in excess of 25 percent of the amount of gross income stated on the return. In such case, the general three-year limitations period is extended to six years.
To invoke the six-year statute of limitations provided for in section 6501(e)(1)(A), respondent has the burden of proving the requisite omission. Bardwell v. Commissioner,38 T.C. 84 (1962), affd. 318 F.2d 786 (10th Cir. 1963); Seltzer v. Commissioner,21 T.C. 398 (1953); Reis v. Commissioner,1 T.C. 9 (1942), affd. 142 F.2d 900 (6th Cir. 1944).Respondent may meet this burden of proof only by affirmative evidence; the presumption of correctness which generally attaches to respondent's deficiency determinations may not be relied upon in this regard. See Reis v. Commissioner,supra.
In the present case, *519 as we have said with relation to the fraud issue, respondent has failed to offer affirmative evidence that would, absent invoking presumptions and inferences, establish by even a preponderance of the evidence that petitioners failed to report any amounts of income on their 1967 tax return. Unlike those cases where reported income is insufficient to account for deposits made to a taxpayer bank accounts, [32] in the present case, petitioners reported gains from security tradings in excess of those amounts which we have found to represent deposits to their accounts, and it has not been affirmatively established that these reported amounts did not, in full, account for respondent's "unexplained" deposits. Therefore, the proven facts on this record are as consistent with the proposition that petitioners reported all gross income they received in 1967, as they are with respondent's contention herein. We cannot base a finding of a 25 percent omission from gross income on such a record. [33]
*520 Respondent is therefore barred by the statute of limitations from asserting deficiencies and additions to tax with respect to petitioners' 1967 tax year. 1968 Tax Year
I Statute of Limitations
Petitioners filed their 1968 Federal income tax return on October 13, 1969. Respondent properly mailed the statutory notice of deficiency with respect to petitioners' 1968 tax year on August 30, 1972, within three years after petitioners filed their 1968 return. Thus, the general three-year statute of limitations does not bar respondent's assessment and collection of the deficiencies asserted with respect to that year. Section 6501(a).
II Burden of Proof
Petitioners, without citation of any relevant authority, generally contend that respondent acted arbitrarily in determining deficiencies in their 1968 income taxes. We must, as a threshold matter, consider petitioners' contention in this regard since our resolution of this issue bears on the proper allocation of the burden of proof with respect to the deficiencies in issue for 1968.
Section 6201 authorizes, and indeed requires, *521 the Secretary of the Treasury to make inquiries, determinations, and assessments of all taxes imposed by the Internal Revenue Code.In general, where the Secretary or his delegate (see section 301.6201-1, Proced. & Admin. Regs.), in the exercise of this authority, timely determines that there is a deficiency in any tax, the taxpayer bears the burden of proving such determination to be incorrect. Rule 142(a); Burnet v. Houston,283 U.S. 223 (1931). Stated another way, respondent's determinations of deficiencies in tax are, in general, presumptively correct and petitioner must prove error in such determinations in order to prevail. Welch v. Helvering,290 U.S. 111 (1933). This general rule is subject to the following qualification: If petitioners can show that the determination of respondent was arbitrary and excessive, e.g., without factual foundation or rational basis, then the respondent must carry the burden of going forward to establish the existence of a deficiency. Helvering v. Taylor,293 U.S. 507 (1935); Jackson v. Commissioner,73 T.C. 394, 401 (1979).
The apparent thrust of petitioners' first argument *522 is that respondent acted arbitrarily in resorting to the unexplained deposits method of determining their income. This contention is without merit. The testimony of the accountant who prepared petitioners' 1968 return makes it clear that petitioners' books and records were incomplete and inadequate. Moreover, after allowing respondent's agent to make a cursory initial review of these records, petitioner refused to make any records available at any time thereafter, and has not submitted any books or records into evidence in this case.
When a taxpayer has made numerous deposits in bank accounts, the sources or nature of which are not accounted for or recorded in books and records maintained by him, or where the taxpayer refuses to make his records available for audit, respondent's resort to the bank deposits method of determining the taxpayer's income has been repeatedly approved. See, e.g., Cupp v. Commissioner,65 T.C. 68, 72 (1975), affd. 559 F.2d 1207 (3d Cir. 1977); Marcello v. Commissioner,380 F.2d 509 (5th Cir. 1967), affg. a *523 Memorandum Opinion of this Court; Estate of Hague v. Commissioner,45 B.T.A. 104, 109 (1941), affd. 132 F.2d 775, 776 (2d Cir. 1943), cert. denied 318 U.S. 787; O'Dwyer v. Commissioner,28 T.C. 698 (1957), affd. 266 F.2d 575 (4th Cir. 1959), cert. denied 361 U.S. 862; Harper v. Commissioner,54 T.C. 1121 (1970). Even when a taxpayer provides books and records which support his return as filed, respondent's resort to the bank deposits method may be proper, since there is no requirement that respondent accept a taxpayer's return or his books at face value. Holland v. United States,348 U.S. 121 (1954); Campbell v. Guetersloh,287 F.2d 878 (5th Cir. 1961); Harper v. Commissioner,supra, at 1129. Respondent's resort to the bank deposits analysis here was therefore clearly not an arbitrary or unreasonable exercise of his authority. Petitioners also appear to contend that the fact that respondent has reduced the amounts originally determined as unreported income from unexplained deposits through subsequent concessions *524 is an indication that respondent's entire determination was arbitrary. We cannot agree with this contention. Respondent's discovery that certain amounts originally determined to be unreported income in fact represented mere retransfers of funds among petitioners' numerous accounts does not, by itself, show that respondent's entire determination was arbitrary so as to relieve petitioners of their burden of proving the other items were also wrong. Anderson v. Commissioner,250 F.2d 242 (5th Cir. 1957), affg. a Memorandum Opinion of this Court, cert. denied 356 U.S. 950; Gobins v. Commissioner,18 T.C. 1159 (1952), affd. 217 F.2d 952 (9th Cir. 1954); Cefalu v. Commissioner,276 F.2d 122 (5th Cir. 1960), affg. a Memorandum Opinion of this Court. Petitioners also appear to argue that respondent's recharacterization as ordinary income the $47,000 which petitioners reported in summary fashion as short-term capital gain was arbitrary and unreasonable. Apparently, petitioners think that respondent may only recharacterize reported amounts when he possesses specific information that the amounts reported *525 were improperly characterized, and that respondent may not find ordinary income merely because petitioner does not furnish proof that the amounts reported in fact represented capital gains. Petitioners' position is completely without merit. Taxpayers have no inherent right to the beneficial tax treatment which is afforded to capital gains. Like any deduction, this special treatment is a matter of legislative grace. See e.g., Interstate Transit Lines v. Commissioner,319 U.S. 590, 593 (1943); New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934). In order to be entitled to these special tax benefits, the taxpayer must be able to demonstrate that he falls within the specific terms of the particular statute which affords such treatment. Deputy v. DuPont,308 U.S. 488, 493 (1940); White v. United States,305 U.S. 281 (1938). While petitioners may have been entitled to characterize some or all of the $47,000 in dispute as capital gains, they refused to provide respondent with books or records, or other evidence, which would establish their right to such characterization. Petitioners therefore cannot complain *526 that respondent's determination was arbitrary or unreasonable, and must suffer the consequences which result from their failure to substantiate their claim.As we have stated in Roberts v. Commissioner,62 T.C. 834, at 836-837 (1974): The Commissioner's determination is not made arbitrary or unreasonable because of his failure to have all the facts when the failure is caused solely by the petitioner. Surely a taxpayer cannot thwart a bona fide investigation so easily and benefit thereby. We hold that when a taxpayer refuses to substantiate his claimed deductions, the Commissioner is not arbitrary or unreasonable in determining that the deductions should be denied. In light of the above, we cannot hold that respondent acted arbitrarily and excessively in determining deficiencies with respect to petitioners' 1968 tax year. The burden of proof therefore remains with petitioners and they must demonstrate error in respondent's determinations in order to prevail. Rule 142(a); Welch v. Helvering,supra.
III Respondent's Deficiency Determinations
A. Unexplained Bank Deposits
Respondent has determined, and we have found, that *527 deposits totaling $70,329.77 were made to accounts which were maintained in the name or under the control of either or both petitioners in 1968, and that said amounts did not constitute mere transfers of funds among petitioners' various accounts. Additionally, respondent determined that this total amount represented income to petitioners which they failed to report on their 1968 return and therefore increased petitioners' taxable income, as reported, by said amount. Petitioners do not contend that the amounts deposited to their accounts in 1968 derived from nontaxable sources. Indeed petitioners have conceded that no such amounts were received by them in 1968. Nor do petitioners contend that any deposits made in 1968 were earned or received by them in prior tax years.Thus, these amounts could not have represented deposits of amounts contained in a "cash hoard." Moreover, with two exceptions noted immediately below, petitioners do not contend, or enter evidence which would support a finding that they did not own any of the accounts included in respondent's bank deposits analysis, or that any of the amounts deposited to these accounts were made by individuals other than themselves. *528 Petitioners nevertheless contend that respondent's addition of these amounts to their income as reported in 1968 was erroneous. Petitioners first assert that respondent was in error in failing to give them credit for the income they reported on their 1968 return when respondent computed the deficiencies for that year. Secondly, petitioners point out that one account to which deposits were made was maintained in the joint names of Mildred and Ruth Pollin, (Mildred's mother), and another account was maintained by petitioner in trust for Fran Stoller, petitioners' daughter. Petitioners maintain that the amounts deposited to these accounts were not made by them but were made by Ruth Pollin and Fran Stoller, respectively, and therefore contend that respondent's inclusion of these amounts in petitioners' income was erroneous.
Throughout their briefs petitioners, who are pro se litigants, have assumed that respondent was under a duty to present particular affirmative evidence which would support each and every determination contained in the statutory notice of deficiency. As we have pointed out in the prior subsection of this opinion, this assumption is unwarranted with respect to *529 the deficiency determinations asserted for 1968. These determinations are presumptively correct, and it is petitioners' burden to establish error therein. Welch v. Helvering,supra.
Petitioners have failed to provide us with any documentary evidence that deposits made to the accounts maintained in Mildred's and Ruth Pollin's joint names or in trust for Fran Stoller were not made in their entirety by Mildred or petitioner. Nor have petitioners produced any documentary evidence which would allow us to find that any of the amounts reported on their 1968 return were deposited to the accounts contained in respondent's bank deposits analysis. We certainly cannot determine from an examination of the numerous statements of petitioners' accounts which formed the basis of respondent's bank deposits calculations, and petitioners' return as filed, whether any amounts reported on that return were in fact deposited to these accounts. The only evidence of the above asserted facts was petitioner's own general testimony to the effect that the 1968 return was correct as filed. However, petitioner's testimony was vague, internally inconsistent, self-serving and unsatisfactory. *530 Moreover, petitioner appeared secretive to us, and was uncooperative with the investigating authorities. We are not required to accept such testimony, and we do not in this case. See Armes v. Commissioner,448 F.2d 972 (5th Cir. 1971), affg. in part, revg. in part a Memorandum Opinion of this Court; Banks v. Commissioner,322 F.2d 530 (8th Cir. 1963), affg. on this issue a Memorandum Opinion of this Court; Weiss v. Commissioner,221 F.2d 152 (8th Cir. 1955), affg. a Memorandum Opinion of this Court. Although respondent made no allowance in his determination of unreported income for the amounts petitioners reported on their return, this is not a doubling up of income under respondent's method.An automatic adjustment for reported amounts is not required where there is no evidence that the reported amounts were used in whole or in part to make the deposits. See Marcello v. Commissioner,380 F.2d at 511; Anderson v. Commissioner,250 F.2d at 245. Moreover, *531 where, as here, petitioner fails to introduce documentary evidence solely within his possession which, if true, would be favorable to him, this failure gives rise to a presumption that, if produced, such evidence would be unfavorable. Stoumen v. Commissioner,208 F.2d 903 (3d Cir. 1953), affg. a Memorandum Opinion of this Court; Lias v. Commissioner,24 T.C. 280 (1955), affd. 235 F.2d 879 (4th Cir. 1956), cert. denied 353 U.S. 935; Shaw v. Commissioner,27 T.C. at 570. In light of these circumstances, and petitioners' failure to call any witnesses which would substantiate their vague and general testimony, as well as the total lack of cooperation which was afforded the investigative authorities, this is a case in which it is peculiarly appropriate to place the burden upon petitioners to show that the amounts reported on their return made up, in whole or in part, such unexplained deposits. Since petitioners have failed to introduce any probative evidence in this regard, we must sustain respondent's determination that the unexplained deposits represented *532 taxable income to petitioners in 1968 which they failed to report on their return. B. Capital Gain vs. Ordinary Income
Petitioners also argue that respondent's recharacterization as ordinary income of certain amounts petitioners reported as capital gain is erroneous. As fully discussed above, the burden rests with petitioners to establish that respondent's determination was erroneous.
The only evidence that petitioners presented was petitioner's own vague, general, and sometimes internally inconsistent testimony. We are not required to accept such testimony, and we do not in this case. Armes v. Commissioner,supra;Banks v. Commissioner,supra;Weiss v. Commissioner,supra. Additionally, however, the testimony of one of respondent's witnesses is relevant in this regard. Sol Bennett testified that the $47,000 which petitioners reported as short-term capital gains on their 1968 return represented a summary of numerous debits and credits to petitioner's brokerage accounts. Mr. Bennett's testimony at most established *533 that these amounts represented a summary of the transactions recorded in such transcripts in 1967. These amounts were reported as a lump sum gain of $47,000 from partnerships and fiduciaries on petitioners' 1968 return, and no partnership return has been submitted into evidence. According to Mr. Bennett's testimony, these amounts were reported as gains from partnerships and fiduciaries because he believed petitioner was acting jointly with another partner in these transactions.
It is well settled that in order for profits to be characterized as capital gain, petitioners must affirmatively establish that (1) the property in question was a capital asset in their hands, and (2) the transaction which generated the gain constituted a "sale or exchange." See Dobson v. Commissioner,321 U.S. 231 (1944).
Section 1221[34] generally provides that the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business) but does not include *534 stock in trade, property includable in inventory, or property held primarily for sale to customers, or subject to the allowance for depreciation, etc. Moreover, the Supreme Court has repeatedly held that the definition of a capital asset must be construed narrowly. Commissioner v. Brown,380 U.S. 563 (1965); Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). Even if we assume that the $47,000 gain reported on petitioners' return was generated by transactions in securities or commodities, we cannot, on this record, conclude that such gains should be *535 afforded capital treatment. The record does not clearly disclose whether the gains were generated by petitioner's trading in securities or commodities for his own account, or from petitioner's sale of securities or commodities to customers in the ordinary course of his trade or business.Petitioner has testified that he was working with a Canadian stock promoter by the name of Irving Kott, and listed his occupation as "financial consultant" on his 1968 return. The distinct possibility therefore exists that petitioner realized these gains in the ordinary course of his trade or business as a dealer in securities, or as a stock promoter. In such a case it would be possible, indeed likely, that the securities or commodities which generated the reported gains were not capital assets in petitioner's hands since they may have been held "primarily for sale to customers in the ordinary course of [petitioner's] trade or business." Section 1221. See, e.g., Frank v. Commissioner,321 F.2d 143 (8th Cir. 1963), affg. a Memorandum Opinion of this Court sub nom. McNutt v. Commissioner;Lauderdale v. Commissioner,9 T.C. 751 (1947); Nielsen v. United States,333 F.2d 615 (6th Cir. 1964). *536 Moreover, since petitioners have failed to introduce any documentary evidence or third-party testimony that would support their contention, we must assume that such evidence or testimony, if produced, would be unfavorable to their position on this issue. Stoumen v. Commissioner,supra;Lias v. Commissioner,supra;Shaw v. Commissioner,supra.
In light of the above, we hold that petitioners have failed to sustain their burden to show that they were entitled to capital gain treatment with respect to the $47,000 here in dispute. Respondent's recharacterization of these amounts as ordinary income will therefore be sustained. C. Constructive Receipt
The final adjustment which remains in dispute is respondent's determination that petitioners received $1,500 of fee income in 1968 which they failed to report on their return. Petitioner, in testimony, admitted to having received a check for $1,500 from C.E. Unterberg Towbin Company for services rendered in connection with an investment in a certain stock. Petitioner also admitted that this amount was not reported in 1968. However, petitioner testified that he *537 felt that said amount was inadequate compensation for the services he performed and therefore returned the check, uncashed, to C.E. Unterberg Towbin Company. Petitioner further testified that he was paid $3,000 in 1975 in satisfaction of the services rendered to C.E. Unterberg Towbin Company in 1968. Petitiner accordingly argues that the $1,500 check was not income to him because he returned it uncashed to the issuer. Respondent contends that even if the facts asserted in petitioner's testimony are true, the $1,500 nonetheless should have been reported by petitioners as income in 1968.
As a starting point, section 451 states the general rule that items of income are includable in gross income in the year received. Section 1.451-2, Income Tax Regs. provides in pertinent part: (a) General Rule.--Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that *538 he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.
Under the rule of constructive receipt, a check is normally income when received. See, e.g., Kahler v. Commissioner,18 T.C. 31 (1952).Moreover, a taxpayer may not normally refuse to accept a check and thereby avoid taxable income. Hamilton National Bank of Chattanooga v. Commissioner,29 B.T.A. 63 (1933). We have held, however, that where a taxpayer demonstrates that his acceptance of a check would compromise his legal posture with respect to a disputed claim, and he refuses to accept the check in a reasonable attempt to protect his legal position with respect to said claim, he will not be deemed to have constructively received the amount tendered and refused. Bones v. Commissioner,4 T.C. 415, 420 (1944); *539 Griffith v. Commissioner,35 T.C. 882, 891 (1961). Under these circumstances, the taxpayer's receipt of the check is considered to be "subject to substantial limitations or restrictions," and if the check is returned to its maker, the amount of the check cannot be deemed to have been constructively received. Applying the above principles to the facts of the present case, we find that, even accepting all of petitioner's testimony as true, he has nonetheless failed to show that the $1,500 amount was not constructively received by him in 1968. The State of New York, petitioners' state of residence in 1968, has incorporated section 1-207 of the Uniform Commercial Code into its consolidated laws, and this provision was in effect for the year 1968. See McKinney's Cons. Laws of New York, Book 62 1/2, Uniform Commercial Code, section 1-207, p. 65. That section provides: A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. *540 Such words as "without prejudice," "under protest" or the like are sufficient.
The New York courts have consistently held that under the above provision, when a party simply endorses a tendered check "without prejudice and under protest," he reserves the right to demand any balance which may be due, even though the check purports to represent final payment for services performed. See Lange-Finn Construction Co., Inc. v. Albany Steel & Iron Supply Co., Inc.,94 Misc. 2d 15 (Sup. Ct. Alb. Co. 1978). Negotiation of such a check does not effect an accord and satisfaction. Ayer v. Sky Club, Inc.,70 A.D. 2d 863, appeal dismissed 48 N.Y. 2d 705 (1979). In the present case, the record does not disclose whether the $1,500 check which was tendered to petitioner purported to represent the entire amount that was due to petitioner from C.E. Unterberg Towbin Company, or contained any condition or limitation upon petitioner's negotiation of the check. Contrast, Bones v. Commissioner,supra. Even if it had, however, it is *541 clear that under New York Law petitioner's negotiation of the check with the appropriate limiting endorsement would not have prejudiced any claim he may have had against C.E. Unterberg Towbin Company for greater amounts. Under such circumstances, we cannot hold that petitioner's purported refusal to accept the check was pursuant to a reasonable attempt to protect his legal position with respect to any further claims he may have had against C.E. Unterberg Towbin Company. Petitioner's receipt of this check in 1968 was therefore not "subject to substantial limitations or restrictions." Accordingly, we hold that the $1,500 made available to petitioner in 1968 was constructively received by him in that year. Kahler v. Commissioner,supra;[35]Hamilton National Bank of Chattanooga v. Commissioner,supra. We will therefore sustain respondent's determination to this effect. IV Fraud
Respondent has determined additions to tax for fraud under section 6653(b) against petitioner for 1968. *542 The burden of proving fraud is on respondent. Section 7454(a); Rule 142(b). The precise character of this burden has already been fully discussed in section II of this opinion. Respondent may not rely upon the presumptive correctness of the deficiency notice to establish any element of his case. Drieborg v. Commissioner,supra.If respondent sustains his burden, however, and affirmatively establishes that petitioner fraudulently underpaid his taxes in any amount, the section 6653(b) additions to tax attaches to the entire deficiency, even though a portion of the deficiency determination is sustained solely by virtue of petitioners' failure to overcome the presumption of correctness which is afforded to respondent's determination. See Shaw v. Commissioner,27 T.C. at 571; Plunkett v. Commissioner,465 F.2d at 303. Although respondent was unable to affirmatively establish that petitioner underpaid his taxes in any amount in 1967, this is not the case with respect to 1968. To the contrary, respondent has, by clear and convincing *543 evidence, demonstrated that petitioner underpaid his taxes in 1968. Respondent relies primarily on his determination of unreported income from unexplained bank deposits, and his determination that petitioner improperly reported $47,000 as capital gains when such amounts should have been reported as ordinary income in support of his fraud assertion. [36] Since it has been clearly established that at least a portion of the deposits made to petitioners' accounts in 1968 represented taxable income to petitioner which was not reported on petitioners' return we need not consider whether respondent's recharacterization of the $47,000 amount is supported by affirmative evidence. *544 Respondent has determined and we have found that the following deposits which did not constitute mere redeposits were made to the following accounts in 1968: Amount of
Account
Maintained in the Name Of
Deposit
Bankers Trust Co.
No. 31343575
Petitioner & Mildred
$21,323.20
Bankers Trust Co.
No. 74809
Petitioner & Mildred
650.00
Lawrence Cedarhurst
Fed. Sav. No. 32276
Mildred
122.80
Lawrence Cedarhurst
Fed. Sav. No. 28169
Petitioner & Mildred
454.00
Lawrence Cedarhurst
Petitioner in Trust for Mildred
59.00
Fed. Sav. No. 28319
in Trust for Fran Mara Stoller
Lawrence Cedarhurst
Fed. Sav. No. 28320
Mildred & Ruth Pollin
3,071.21
Kroll, Dillon & Co.
No. 7980225
Petitioner
1,100.00
Chemical Bank
No. 036001589
Philip Stoller & Co.
43,549.50
$70,329.71
Respondent additionally determined that this total amount represented unreported income to petitioners in 1968. Petitioners dispute respondent's ultimate determination with two basic arguments. First, petitioners contend that Lawrence Cedarhurst Fed. Sav. account numbers 28319 and 28320 are not now and never were their property, and that the deposits made thereto were not *545 made by them. [37] Second, petitioners contend that, after reducing the "unexplained" deposits by the amounts deposited in these two accounts, all remaining deposits are accounted for by amounts reported on petitioners' 1968 return. Initially, we must outline the parameters of our inquiry. Except *546 with respect to the two accounts noted above, petitioners do not contend that any amounts deposited to their accounts in 1968 derived from nontaxable sources. Indeed they would be precluded from so contending since, as noted in our findings, they have conceded through stipulation and pleadings that no amounts were received by them in 1968 from nontaxable sources. Nor do petitioners contend that the deposits to these accounts were earned or otherwise received by them in prior taxable years or that any such deposits were made by persons other than themselves. It is therefore effectively established that, except with respect to amounts deposited to the two disputed accounts, petitioners received income from taxable sources in 1968 in the total amount of the deposits. Thus, even assuming petitioners did not deposit any amounts to Lawrence Cedarhurst Fed. Sav. accounts numbers 28319 or 28320, respondent's bank account analysis clearly and convincingly establishes that the amount of $67,199.50 deposited to these accounts was gross income to petitioners in 1968. See United States v. Massei,supra.To the extent that respondent can affirmatively show that any *547 portion of this amount was not reported on petitioners' return, he will have satisfied the first prong of his prima facia case -- i.e., he will have demonstrated an underpayment. Initially, petitioners reported gross gains from commodity tradings in 1968 of $57,443.50, gains from partnerships and fiduciaries of $47,000 and interest income of $1,994.86. Thus, according to petitioners' returns, they had realized gross gains of $106,438.36 in 1968. No partnership return has been placed into evidence, and we are unable to determine from other evidence of record, if and when, the $47,000 reported by petitioners as gains from partnerships and fiduciaries was made available to petitioners. It is possible, however, that said amounts may have been at petitioners' disposal very early in 1968. Moreover, it is clear that no portion of these amounts has been credited to petitioners' as redeposits in respondent's bank deposits analysis, and it is therefore possible that these reported amounts could account for a portion of the deposits which respondent determined to be "unexplained," including those made early in that year. Stated simply, respondent has not shown that $47,000 of the amounts *548 determined to represent "unexplained deposits," were not, in fact, reported on petitioners' return. However, even crediting this $47,000 amount to deposits which clearly represented taxable income to petitioners, there still remain deposits of $20,199.95 which are not accounted for on petitioners' return. Documentary evidence clearly establishes that the $48,882.50 and $8,052 reported on petitioners' return as gains from trading in silver and sugar futures, respectively, could not have been the source of any portion of these deposits totaling $20,199.95. The transcript of petitioners' account with Kroll, Dillon & Co. shows that these amounts were never withdrawn from that account.In fact, these gains were reduced to zero by petitioner's further trading on the Kroll, Dillon & Co. account in 1968 and by the end of that year, petitioner carried a debit (negative) balance of $3,420.98. Thus, no portion of these amounts reported as gains on petitioners' returns could account for the deposits made to petitioners' other accounts. These amounts therefore necessarily had another taxable source. The only other amounts of income that petitioners reported on their 1968 return were $1,994.86 *549 of interest income and $509 of gain from cocoa futures contracts. These amounts are clearly insufficient to account for the deposits made to petitioners' accounts which are otherwise unaccounted for on petitioners' return. We therefore find that respondent has affirmatively shown through clear and convincing evidence that petitioners underpaid their taxes in some amount in 1968. It only remains for us to determine whether this underpayment was fraudulently conceived under the facts of this case.
Whether petitioner underpaid his tax with the requisite fraudulent intent is a factual question which must be resolved by an examination of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner,supra. Since fraud can seldom be established by direct proof, the requisite intent may be inferred from a showing by respondent that petitioner's conduct was intended to conceal, mislead, or otherwise prevent the collection *550 of taxes that petitioner knew or believed he owed. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Acker v. Commissioner,26 T.C. 107 (1956). However, since respondent's assertion of fraud requires an inquiry into the taxpayer's frame of mind, seldom can a single act or omission prove determinative of the requisite fraudulent intent. Rather, such intent or lack thereof must generally be determined by surveying a taxpayer's whole course of conduct. Stratton v. Commissioner,54 T.C. 255, 284 (1970). With the above principles in mind, we have carefully reviewed the entire record in this case, and find that respondent has clearly and convincingly demonstrated that petitioners' underpayment of tax in 1968 was due to fraud. Initially, it is clear from the testimony of Sol Bennett that petitioner failed to keep adequate books and records despite the fact that he was engaged in many complicated commodity futures transactions. The failure to keep adequate books and records *551 has frequently been held to be an indication of fraudulent intent. See Ruark v. Commissioner,449 F.2d 311 (9th Cir. 1971), affg. a Memorandum Opinion of this Court. [38] More importantly, petitioner demonstrated a complete failure to cooperate with the Internal Revenue Service in its conduct of the audit of his return. After allowing respondent's agent an initial review of certain incomplete records, petitioner refused to produce any further records or substantiate any of the items claimed on his return. In fact, he retrieved the records which were in his then accountant's possession, refused to make them available for further examination, and continued to refuse to cooperate with respondent's agents throughout their investigation or produce any further books or records, despite respondent's repeated requests. His conduct went beyond mere noncooperation and was affirmatively obstructive. This failure to cooperate with respondent's agents is a strong indication of guilty knowledge on petitioner's part. Millikin v. Commissioner,298 F.2d 830, 836 (4th Cir. 1962), *552 affg. a Memorandum Opinion of this Court; Estate of Granat v. Commissioner,298 F.2d 397 (2d Cir. 1962), affg. a Memorandum Opinion of this Court; Baumgardner v. Commissioner,251 F.2d 311, 322 (9th Cir. 1957), affg. a Memorandum Opinion of this Court. Neither during the investigation nor at trial did petitioner make any serious attempt to show error in respondent's determinations of unreported income, except through arguments, unsupported hypotheses (what could or might have happened) and his own rambling, evasive and self-serving testimony.
Further, in 1974, petitioner was convicted of various criminal securities violations involving his participation in certain fraudulent interstate transactions, manipulative and deceptive devices, frauds and swindles, mail fraud, and making false statements to and concealing information from the Securities and Exchange Commission. The stock manipulation scheme of which petitioner was convicted commenced during 1968 and continued until mid-1969. Thus, *553 petitioner was involved in this scheme when he filed his 1968 return. We therefore consider petitioner's conviction of the above crimes to be probative evidence of fraudulent intent for purposes of this case. As we have stated in McGee v. Commissioner,61 T.C. 249, 260, affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976): [39]
While evidence that a taxpayer was attempting to defraud another in a business transaction may not be direct evidence of fraud with intent to evade tax * * * the Court is entitled to consider such evidence along with other evidence in determining the intent of the taxpayer in doing certain acts because it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax.
Finally, it is clear that petitioner was a well educated individual *554 and sophisticated businessman, who was quite competent to maintain adequate books and records. We are satisfied that he knew of his tax reporting and payment responsibilities to the Federal fisc. We are convinced on this record that any underpayment of petitioner's tax in 1968 was intentional rather than inadvertent. See Insolera v. Commissioner, an unreported case (2d Cir. 1980, 45 A.F.T.R. 2d 80-569, 80-1U.S.T.C. par. 9164), affg. T.C. Memo. 1977-424; Iley v. Commissioner,19 T.C. 631 (1952). We therefore hold that respondent has sustained his burden of proving fraud with respect to petitioner's 1968 tax year, and the determination of additions to tax for that year will be sustained. To reflect the foregoing, as well as various concessions made by the parties herein, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to sections of the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all references to Rules are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Petitioners have conceded that interest income of $269.66 which they failed to report on their 1967 return is properly includable therein, and have agreed to a reduction of charitable contribution deductions in the amount of $282.00 for 1967. Respondent has agreed that petitioners are entitled to an additional itemized deduction of $2,156.33 in 1967 for taxes paid in that year.↩
3. Although petitioner asserted in testimony herein that any advisory services he rendered to Bank Hoffman through Mr. Herbert during 1967 and 1968 were rendered without any expectation of compensation, such testimony is directly contradicted by testimony which petitioner gave before the Securities and Exchange Commission in connection with an investigation regarding certain violations of the securities laws. This testimony has been entered, without objection, into evidence herein. In such testimony, petitioner stated that, with respect to advisory services he rendered to Bank Hoffman: If it works out properly, I receive a percentage of potential profits, but I am not on a retainer or a fee with them in any sense. It is dependent upon success. Petitioner's general testimony in the instant case regarding his relationship with Bank Hoffman was extremely evasive, self-serving and completely uncorroborated. Moreover, we find petitioner's testimony herein to the effect that he provided potentially valuable investment advice to Bank Hoffman, a totally unrelated party, without any compensation arrangement whatsoever, to be simply unbelievable, especially when considered in light of the fact that he listed his occupation as a "financial consultant" on his 1967 and 1968 returns.↩
4. These findings are pursuant to concessions made in petitioners' reply to respondent's answer herein and pursuant to petitioners' stipulation.↩
5. The items of short-term capital gain reported on petitioners' return were reported in the summary fashion stated above. No transactional breakdown was supplied, and none of the individual transactions which gave rise to these gains were anywhere disclosed on petitioners' return. As noted above, Mr. Bennett could only list these gains in this summary fashion because of the inadequacy of petitioners' records. It is not discernable from the face petitioners' return when in 1967 any of these short-term capital gains were recognized.↩
6. The losses reported from Kroll, Dillon & Co. and L. J. Forget, nominees, were stated in summary fashion, and it cannot be determined from the face of petitioners' return when the purchases and sales occurred which resulted in these losses. Petitioners' return does disclose that the Alleghany Mining Stock was purchased in August of 1967 and became worthless in December, 1967. The partnership return of Levin Stoller & Co. has not been submitted into evidence, and we are therefore unable to determine how those losses were generated. The return of 79 Wall St. Corp. has been entered into evidence. The loss reported on that return was generated, in full, by cash expenditures, such as advertising, salaries, rents, etc. No portion of that loss consisted of noncash expenses such as depreciation.↩
7. This $47,000 amount was reported in the summary fashion stated aove and, according to the testimony of Mr. Bennett, represents a summary of numerous debits and credits which were recorded in certain of petitioner's securities accounts in 1968. Apparently this amount was reported as gain from partnerships and fiduciaries because Mr. Bennett believed petitioner was acting jointly with another party in these transactions. No partnership return has been entered into evidence herein, and it is not discernable from the face of petitioners' return when in 1968 these gains were recognized. Mr. Bennett was unable to detail the particular purchases and sales which resulted in this purported gain because as noted, supra,↩ the records provided by petitioner were inadequate for this purpose. 8. On a separate schedule attached to their 1968 return petitioners listed each of the commodity transactions stated above which are followed by a specific commodity in parenthesis. Included on the schedule was the date each commodity future was purchased and sold, the gross sales price, petitioner's cost basis, and expenses of sale. According to petitioners' return, the sugar futures listed above were purchased in December, 1967, and sold on April 15, 1968; the cocoa futures were purchased on December 12, 1968, and sold on December 13, 1968; and the silver futures were purchased on November 24, 1967, and sold on May 27, 1968.↩
9. As noted in footnote 8, supra,↩ petitioners attached a schedule to their 1968 return which provided information relating to each of the above commodity losses which are followed by a specific commodity in parenthesis. According to this schedule, the potato futures which resulted in the $6,385 loss were purchased between October and December, 1967, and sold January 1, 1968; the silver futures which resulted in the $13,233.75 loss were purchased on Decemer 29, 1967, and sold on Novemer 29, 1968. With respect to long-term gains listed above, the sugar futures which resulted in $2,588 loss were purchased on September 7, 1967, and sold on April 15, 1968; and the silver futures which resulted in the $16,283.75 loss were purchased on November 13, 1967, and sold on May 28, 1968. No 79 Wall St. Corp. return for 1968 has been entered into evidence herein.
10. Mr. Blumenfeld found out that petitioner maintained various bank accounts with particular banks and brokerage firms through information contained on pertinent Forms 1099.↩
11. Respondent's answer herein was amended to give effect to the above changes.↩
12. Apparently, Mr. Gallaro had received information from a special agent that these items may, in fact, have represented fee income which petitioner received through Bank Hoffman.↩
13. The following explanatory symbols are used: * indicates those accounts that were maintained jointly by petitioners (or by petitioner or Mildred in trust for either Fran (their daughter), or David (Mildred's son)); + indicates those accounts that were maintained in petitioner's name; tt indicates those accounts that were maintained in Mildred's name; +/- indicates those accounts maintained in the joint names of Mildred and Ruth Pollin (Mildred's mother); and o indicates the account maintained in the name of Philip Stoller & Co. ↩
14. Although respondent determined that $34,194.77 was deposited to this account, this amount is unsupported by the record herein. We have therefore adjusted respondent's determination so that it will accord with the evidence submitted.↩
15. See footnote 13, supra.↩ No adjustments to respondent's calculations are required with respect to deposits occurring in 1968.
16. We consider such a method to be reasonable under the facts of this case since no actual checks have been entered into evidence. See and compare Estate of Mason v. Commissioner,64 T.C. 651 (1975), affd. 566 F.2d 2↩ (6th Cir. 1977). 17. No adjustments to respondent's computations of transfers of funds and deposits of loan proceeds are required for 1967.↩
18. No adjustment to respondent's computations of transfers of funds and deposits of loan proceeds are required for 1968.↩
19. Convictions were found for violations of the following Federal statutes: 15 U.S.C. secs. 77q(a), 77x, 78j(b), 78ff; 18 U.S.C. secs. 2, 1001, 1341↩.
20. In the deficiency notice, respondent actually determined that petitioners had made unexplained deposits totaling $145,359.06. Respondent has now conceded that only $128,750.97 worth of deposits remain unexplained. Accordingly, we will refer only to the latter amount herein.↩
21. This amount represents the amount determined by respondent to constitute unexplained deposits reduced by concessions made by respondent. Originally, respondent determined unexplained deposits, amounting to $97,777.14. Hereinafter we will refer only to the lesser amount.↩
22. Section 6501(a) provides: (a) General Rule.--Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
23. Section 6501(c)(1) provides: (c) Exceptions.-- (1) False Return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
24. Section 6501(e)(1)(A) provides in pertinent part: (e) Substantial Omission of Items.--Except as otherwise provided in subsectin (c)-- (1) Income Taxes.--In the case of any tax imposed by subtitle A-- (A) General Rule.--If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *↩
25. See, also, Pappas v. Commissioner,T.C. Memo. 1981-639 (1981); Estate of Alpirn v. Commissioner,T.C. Memo. 1959-60↩ (1959).
26. Petitioners have conceded that they understated interest income on their 1967 return by $269.66 and overstated a charitable contribution by $282. Respondent does not rely upon these minor amounts to show fraud, and no evidence which would show that these items were intentionally misstated has been presented. Moreover, respondent has conceded that petitioners are entitled to an additional itemized deduction of $2,156.33 for taxes paid in 1967. These items therefore cannot support a finding that petitioner fraudulently underpaid his tax in 1967, and will not be discussed further herein.↩
27. The special agent who allegedly supplied Mr. Gallaro with this information was conducting a criminal investigation of petitioners' 1967 and 1968 returns based upon a fraud referral submitted to the Intelligence Division by Mr. Gallaro.↩
28. Petitioner's testimony before the Securities and Exchange Commission was given in connection with that agency's investigation of a stock manipulation scheme. As a result of this investigation, petitioner was subsequently indicted and convicted of securities fraud. The testimony of petitioner before the Securities and Exchange Commission was entered into evidence in the instant case without objection.↩
29. Petitioners have conceded through pleadings and stipulation that they received no amounts of income from nontaxable sources in the years in issue, see United States v. Massei,355 U.S. 595↩ (1958), and have not alleged that any amounts deposited to their accounts derived from amounts earned or received in prior years.
30. Respondent attempts to rely upon certain testimony of Sol Bennett, the accountant who prepared petitioners' returns, in an effort to establish that this $120,000 amount could not account for the "unexplained deposits." However, the testimony of Mr. Bennett on this point was equivocal at best. Respondent questioned Mr. Bennett whether he remembered seeing large withdrawals of cash from the L. J. Forget account in 1967. Mr. Bennett responded that: "All I would see is debits and credits or buy or sell slips. I don't remember what would happen to those debits and credits." Upon further questioning, Mr. Bennett stated that he did not remember seeing large↩ withdrawals of cash from this account. We found Mr. Bennett to be an honest witness, and we think that his contradictory responses to the above line of questioning was a function of the long period of time which passed between when he prepared petitioners' returns and when he testified in the present case. In any event, we do not think that this testimony can legitimately be read to stand for the proposition that petitioners did not withdraw gains recognized from the L. J. Forget account and deposit them in their other accounts. Certainly it does not constitute clear and convincing evidence of such. We therefore reject respondent's attempt to rely on this testimony for these purposes.
31. Our finding that respondent has failed to establish that petitioners had unreported income, or that petitioners reported amounts as capital gain that should have been reported as ordinary income, effectively precludes respondent from relying upon the provisions of section 6501(c)(1) to extend the statute of limitations in this case since respondent has not alleged or proved that petitioners' 1967 return was false or fraudulent with intent to evade taxes in any other respect.Thus, the facts of this case do not permit a conclusion that petitioners' 1967 return was false or fraudulent with intent to evade taxes even though respondent has failed to show an underpayment of tax. We note parenthetically, however, that the provisions of sections 6501(c)(1) and 6653(b) may not always be coextensive. Compare Summerill Tubing Co. v. Commissioner,36 B.T.A. 347 (1937); see also, Estate of Leyman v. Commissioner,40 T.C. 100 (1963), modified, 344 F.2d 763↩ (6th Cir. 1965).
32. See Lewis v. Commissioner,T.C. Memo. 1957-158↩ (1957). 33. Respondent does not rely on his determination that the $120,000 reported by petitioners as short-term capital gain in fact represented ordinary income in support of his contention that section 6501(e)(1)(A) applies to extend the normal three-year statute; nor could he, since the income was disclosed on the return. See Green v. Commissioner,7 T.C. 263 (1946), affd. 168 F.2d 994 (6th Cir. 1948); Estate of Webb v. Commissioner,30 T.C. 1202↩ (1958).
34. Section 1221(1) provides: For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;↩
35. See, also, Fogle v. Commissioner,T.C. Memo. 1966-148↩ (1966).
36. Respondent also briefly argues that the underpayment of tax which resulted from petitioners' failure to include the $1,500 check that petitioner received from, and returned to C.E. Unterberg Towbin Company in 1968, supports his fraud determination. However, in order to rest his fraud determination on this omitted item, respondent must show that the item was omitted "with intent to defraud the government by calculated tax evasion." Iley v. Commissioner,19 T.C. 631, 635↩ (1952). We do not think that the record clearly establishes that this amount was omitted by petitioner in a deliberate attempt to evade taxes believed to be owing. We therefore do not hinge finding of fraud upon petitioners' omission of this item.
37. Petitioners do not argue that the account maintained in the name of Philip Stoller & Co. at Chemical Bank was not owned by petitioner in his individual capacity, or that funds deposited thereto were not earned by petitioner in such capacity. In any event, such argument would be unwarranted in light of the affirmative evidence of record. The record clearly establishes that this account was owned by petitioner, the individual. A total of $18,200 was withdrawn from this account in 1968 and deposited either in one of petitioner's other personal bank accounts or in a brokerage account in petitioner's name. Despite the fact that this account was maintained in the name of Philip Stoller & Co., we nonetheless find no difficulty in concluding that petitioner owned this account in his individual capacity. Compare Bromley v. Commissioner,T.C. Memo. 1964-316↩. (1964).
38. See, also, Hagerty v. Commissioner,T.C. Memo. 1981-234; Kendrick v. Commissioner,T.C. Memo. 1980-270↩.
39. See, also, Bachman v. Commissioner,T.C. Memo. 1980-517↩.